[Civ. No. 696.   Third Appellate District.—December 31, 1910.]

## GEORGE PETTIT, Jr., Respondent, v. WILLIAM FORSYTH, Appellant.

CORPORATIONS—CONTRACT FOR NONASSESSABLE STOCK AND TO PAY ASSESSMENTS—ACTION FOR BREACH—SEVERANCE OF RIGHTS—SALE OF PLAINTIFF'S STOCK.—Where contracts between plaintiff, defendant and a third party resulted in forming a corporation, of which plaintiff and the third party were to own one-third of its stock and defendant one-third thereof, the remaining one-third to be sold as treasury stock, and it was agreed that the stock jointly held should be nonassessable and that defendant would pay all assessments levied thereon, and before an assessment was levied such joint rights were severed by defendant's acquisition of the rights of such third party, and the issuance of severed shares to plaintiff, after which plaintiff's shares were allowed by defendant to be sold to the corporation for a delinquent assessment thereon which he declined to pay, the plaintiff may recover from defendant the value of his stock in an action for breach of his contract to pay the assessment.

ID.—PARTIES—NONJOINDER OF PARTY SELLING TO DEFENDANT.—The third party who had sold and transferred his rights to the defendant had no interest in the subject of the action, and was not a proper

party plaintiff, nor a necessary party defendant, his rights having been severed and vested in the defendant.

ID.—NATURE OF CONTRACT FOR NONASSESSABLE STOCK—APPLICABILITY TO EVERY SHARE.—The contract for nonassessable stock and to pay assessments upon "said stock" was applicable to every share thereof, and the contract rights of the third party and of the plaintiff having been severed from each other by the action of the defendant, the contract was broken by defendant's refusal to pay the assessments upon plaintiff's severed shares.

ID.—CONSTRUCTION OF CIVIL CODE—PRESUMPTION OF JOINT RIGHTS OVERCOME—ACTION PROPERLY BROUGHT BY PLAINTIFF.—Though section 1431 of the Civil Code provides that "An obligation imposed on several persons or a right created in several is presumed to be joint and not several . . . and can be overcome only by express words to the contrary," such presumption has been overcome by the words of the contract, and since plaintiff alone has sustained injury by violation of the contract, the action was properly brought by him.

ID.—PLEADING—SALE OF STOCK FOR DELINQUENT ASSESSMENT—DEFECT IN COMPLAINT CURED BY ANSWER—SUBSCRIPTION TO ONE-FOURTH OF STOCK.—Where the complaint avers the sale of plaintiff's stock for a delinquent assessment, but fails to aver specifically that one-fourth of the capital stock had been subscribed, such defect is cured by the averment of the answer that one-third of the capital stock had been originally issued to plaintiff and the third party, which is more than one-fourth of the capital stock.

ID.—VALUE OF STOCK AT DATE OF SALE—OMISSION CURED BY ANSWER.—An omission of the complaint specifically to aver the value of the stock at the date of the sale is cured by a specific issue in the answer as to the value of the stock at that date.

ID.—IMPLIED AVERMENT AS TO OWNERSHIP OF STOCK AT DATE OF SALE.—Although there is no specific averment as to ownership of the shares sold at date of the sale, yet such averment is implied by the averment that "said stock was sold away from plaintiff."

ID.—ERROR IN OVERRULING SPECIAL DEMURRER HARMLESS.—Although the complaint is obnoxious to a special demurrer, where it appears from the record that no injury resulted to the defendant, and that all uncertainty and ambiguity was entirely removed by the evidence, there is no ground of reversal in overruling such demurrer.

ID.—BREACH OF AGREEMENT TO PAY ASSESSMENTS—PURPOSE OF LEVY—INDEFINITE COMPLAINT—ABSENCE OF INJURY.—Though the complaint does not definitely aver that the levy of the assessment which the defendant was to pay was for the object or purpose named in the statute, yet where the contract under which the assessments were to be paid is made part of the complaint and shows by its terms that defendant was to pay all assessments levied "for the purpose of carrying on the business of the corporation," and the resolution of the

directors shows that it was levied for that purpose, the indefiniteness of the complaint is without injury requiring a reversal.

ID.—SUFFICIENCY OF EVIDENCE—TITLE OF PLAINTIFF SUPPORTING ACTION.—It is held upon a review of the evidence that it is sufficient to sustain the judgment as rendered, and to show that the plaintiff received the shares of stock to which he was entitled under his contract with the defendant, and that he had the right to maintain the action.

ID.—ERROR IN AMOUNT OF VERDICT—MISAPPREHENSION OF INSTRUCTION BY JURY—CORRECT MODIFICATION BY TRIAL COURT ASSENTED TO—JUDGMENT WITHOUT PREJUDICE.—Where there was a manifest error in the amount of the verdict owing to an apparent misapprehension of the instructions of the court, and the court's proposed modification of the judgment as a condition of denying a new trial was assented to by plaintiff, and it is manifest that the judgment as modified is without prejudice to the defendant, it will be affirmed.

APPEAL from a judgment of the Superior Court of Fresno County, and from an order denying a new trial. H. Z. Austin, Judge.

The facts are stated in the opinion of the court.

L. L. Cory, for Appellant.

M. K. Harris, W. D. Foote, John H. Miller, W. K. White, and Crittenden Thornton, for Respondent.

THE COURT.—This case is here on appeal from the judgment, on the verdict of a jury, in plaintiff's favor, and from the order denying defendant's motion for a new trial. A general and special demurrer to the complaint was interposed and overruled, which gives rise to the principal questions now before us and calls for a sufficiently full statement of the pleading thus attacked.

The complaint sets forth that on December 31, 1895, defendant, "as party of the first part, and plaintiff and one John D. Sprower, as parties of the second part," entered into an agreement, which is attached to the complaint as Exhibit "A"; that on June 24, 1896, the same parties entered into another contract, which is attached to the complaint as Exhibit "B"; and on June 26, 1896, they entered into a still further contract, which is attached to the complaint as Exhibit "C"; that "thereafter and heretofore, in pursuance of said

agreement, Exhibit 'B,' a corporation was formed under the laws of the state of California, known as the Forsyth Seeded Raisin Company, with a capital stock of $100,000, divided into 1,000 shares of the par value of $100 each''; that pursuant to said agreement ''B,'' on or about April 12, 1899, there ''were issued and delivered to this plaintiff '' 167 shares of the capital stock of said corporation, of which, on April 19, 1899, ''plaintiff was the owner and holder of 152 shares . . . so issued to him, and said shares were of the value of $15,200.00''; that ''on said date, at the procurement of defendant, an assessment of $6 per share, including said 152 shares so owned and held by plaintiff, was levied upon the capital stock of said corporation, payable on May 22, 1899,'' on which last-named day ''said stock of plaintiff's became delinquent on account of the nonpayment of said assessment, and thereafter, on June 12, 1899, was duly advertised and sold to pay said delinquent assessment, and at said sale said stock was sold away from plaintiff, and he was wholly unable to pay said assessment, or any part thereof, and the whole of said stock became and is lost to him''; that plaintiff and said Sprower have duly performed all the conditions on their part to be performed by said agreements, ''A,'' ''B'' and ''C''; that prior to the sale of said stock, plaintiff requested defendant ''to pay the assessment so levied thereon, but defendant neglected and failed to pay the same, or any part thereof, to plaintiff's great damage, to wit, his damage in the sum of $15,200.''

Exhibit ''A'' purports to be between ''Wm. Forsyth of Fresno, California, of the first part, and George Pettit, Jr., and John D. Sprower, both of Brooklyn, New York, of the second part,'' in which ''first party'' agrees to advance money ''for the manufacture by the parties of the second part'' of certain machines for seeding raisins, to be delivered in New York and thence taken to Fresno by first party. In consideration of such advance by first party, ''the parties of the second part agree to apply for letters patent . . . before the manufacture and delivery of the said machines to party of first part.'' It was further agreed that ''the parties of the second part—one of them''—should go to Fresno to superintend the running of the machines, and they also agreed not to make these machines for persons other than first party; money

advanced by first party was to be charged to the business of seeding raisins and first party and second parties were to "share alike in the profits in the business of seeding raisins." "The party of the second part shall be entitled to draw not to exceed $150 per month for living expenses; said amount to be charged against his share in the business." (Presumably referring to person who was to go to Fresno.) This contract bears date December 31, 1895, and was to continue three years from its date. On the twenty-fourth day of June, 1896, the contract, Exhibit "B," was entered into. It purports to be "between Wm. Forsyth, . . . party of the first part, and George Pettit, Jr., and John D. Sprower of Brooklyn, New York." It refers to the contract of December 31, 1895, and states that it is deemed best to form a corporation under the name of the Forsyth Seeded Raisin Company, with a capital stock of $100,000, divided into 1,000 shares of $100 each, for the purpose of dealing in the articles mentioned in said first contract; also that it is deemed best to modify the terms of said contract, and that "the contract heretofore made by the parties hereto shall be transferred and assigned to said corporation." "Now, therefore, in consideration of the premises, it is mutually understood and agreed by and between the parties hereto: 1. That said first party will, at his own expense, incorporate said company upon the lines aforesaid, that the second parties will take and subscribe for and receive one-third of the capital stock of said company. Said stock so delivered to said second party shall be unassessable, and if any assessments are at any time levied upon said stock for the purpose of carrying on the business of the corporation and paying the necessary expenses thereof, the same will be borne by said first party." First party was to hold one-third of the stock and the other third was to "be sold and disposed of to the best advantage, so as to interest parties in the said corporation and the purposes thereof."

"2. Said first party is thereupon a transfer unto said corporation so to be formed, the contract heretofore made between the parties hereto," and the first party was to be released from further obligations thereunder, and when assigned to said corporation said contract "shall be continued for the further period of forty-seven years from and after the termination thereof as specified in said contract."

3. One-third of the stock of the corporation was to "be sold by first party upon such terms and prices as may be agreed upon, but in no event for a less sum than ———— per cent of the par value thereof."

4. Upon the assignment of said first contract to the corporation, second parties relinquished "any claim to any compensation and to any profits to be paid them, or either of them, under or in pursuance of the terms of said contract, but in lieu thereof, are to receive their proportion of the profits as the owners of a portion of the capital stock of said corporation."

Two days later, to wit, June 26, 1896, the parties entered into contract, Exhibit "C," wherein reference is made to contracts "A," and "B," by which latter it is stated in Exhibit "C," that "the party of the first part should receive one-third of the capital stock of said corporation, and the parties of the second part should together receive one-third of the capital stock of said corporation." "And whereas said parties of the second part have agreed to assign to said corporation the whole right, title and interest in a certain application for letters patent, serial number 577,386, filed January 30, 1896, reserving a license to themselves and another; And whereas George Pettit, Jr., one of the parties of the second part, has been requested to go to California to superintend the putting up and operating of said raisin-seeding machines and other work connected with the business of said corporation; Now therefore, in consideration of the premises, the party of the first part agrees to use his influence and the votes of his shares of stock to have" Pettit appointed as an officer of the corporation at a salary of $1,200 per annum and "to use his influence and the votes of his shares of stock . . . in the interest of the parties of the second part, or either of them, and to vote with them on all questions affecting their rights or privileges in said corporation, and the parties of the second part in like manner agree to use their influence and votes in the interest of the party of the first part, and to vote with him on all questions affecting his rights or privileges in said corporation."

The demurrer is for want of sufficient facts; also that the complaint is ambiguous in that it does not appear therefrom what the market value of plaintiff's alleged stock was at any

time, or whether it had any value at the time of the alleged assessment, or sale thereunder; that it is uncertain in that it does not appear therefrom "how, by whom or in what manner any assessment was ever levied upon the capital stock of said corporation, nor in what manner nor by whom any stock of said company was alleged to have been sold." As further ground defendant "does specially demur to said complaint for the reason that the same wholly fails to show that each and all the steps and proceedings taken and ending in the alleged sale of said stock were not so had and taken with the full knowledge, notice and consent of the plaintiff." Also that there "is nonjoinder of parties plaintiff in this, that John D. Sprower is a necessary party plaintiff herein."

1. Appellant contends that by its terms Exhibit "B" is a joint contract and hence plaintiff alone cannot maintain the action. In stating his position he declares: "By its express terms the defendant did not agree to pay any assessment which might be levied against any stock belonging to Mr. Pettit personally, but his only agreement was to pay any assessment which might be levied upon the stock delivered to Pettit and Sprower under the agreement." It is insisted that plaintiff, under the contract, has no right "to enter court to bring any action without in some manner bringing in Mr. Sprower on whom the right was conferred jointly with himself." The objection assumes a twofold aspect, one relating to the cause of action, and the other to the necessary parties to the proceeding. Considering the latter consideration first, it may be said that the evidence shows without any conflict that Sprower has no interest in the subject matter of the action, and therefore is not a necessary or proper party plaintiff. Before the assessment complained of was levied Sprower had disposed of all his interest in the stock and it had become the property of appellant. No cause of action could be established in his favor, as he was not injured by an assessment levied upon property that belonged to another. It is true that this does not appear by the complaint, but it is manifest that it would have been idle to attempt to state a cause of action in behalf of Sprower which was diametrically opposed to the evidence. In any event, it is clear that appellant was not prejudiced by the failure to make Sprower a party to the action. The only contention in this connection

worthy of serious discussion is that it was the intention of the parties that Forsyth should protect the stock only while it was the joint property of Pettit and Sprower, and, therefore, since it appears that the ownership had been severed before the assessment was levied, no cause of action is stated. It will be conceded that if the contract, properly construed, indemnifies each of the parties of the second part against the payment of any assessment on the stock, it is of no consequence, as far as this action is concerned, that Pettit and Sprower joined in one contract with Forsyth instead of executing separate instruments. It is also true, as stated by appellant, that "when several persons are parties to a contract, some of the provisions may relate solely and separately to one of the parties and others to another party," and, he might have added, some of the provisions may relate to each party and some to both jointly.

What did the parties intend in the contract before us? Did they have in view the restricted purpose contended for by appellant or was their design to protect the separate interest of each in the stock? It is to be observed that Mr. Forsyth agrees that "said stock so delivered to said second party shall be unassessable, and if any assessments are at any time levied upon said stock for the purpose of carrying on the business of the corporation and paying the necessary expenses thereof, the same will be borne and paid by said first party." There is no doubt as to what "said stock" refers to. It was the stock to be issued to Pettit and Sprower. And when Forsyth agreed to pay any assessment levied on said stock, the conclusion is irresistible that he intended to pay any assessment that might be levied on any of said stock. "Said stock" certainly includes every share of it. Furthermore, he is to pay the assessment that may be levied at any time—not simply during the joint ownership of Pettit and Sprower. A fair construction of the language used is entirely inconsistent with the narrow view taken of the contract by appellant. Besides, it seems unreasonable that the parties of the second part should agree that this important provision of the contract should be operative only while they were the joint owners of the stock. According to appellant's theory, the moment there was a severance of interest, either by the act of the parties or by operation of law, the party of the first part became re-

lieved of any liability to pay any assessment on any of said stock. We do not think this was contemplated by the parties, and it is opposed to the natural and reasonable import of the terms used in the contract. It is likewise opposed to the construction put upon the contract by the parties themselves by the manner in which the certificates were issued. It is true that one certificate was issued to Pettit and Sprower jointly, but on the same day it was canceled by certificate No. 14 issued to Forsyth, trustee, for 314 shares and by certificate No. 15 for fifteen shares sold by Pettit to E. J. Baber. Afterward the 152 shares in controversy were issued to plaintiff in cancellation of shares that had been transferred to Forsyth. The haste of the parties to sever the shares issued to Pettit and Sprower is hardly consistent with the view of the contract urged upon us by appellant.

We may admit that section 1431 of the Civil Code is applicable, which provides that ''An obligation imposed upon several persons or a right created in favor of several persons is presumed to be joint and not several . . . and can be overcome only by express words to the contrary,'' but we think the presumption has been overcome by the words of the contract, and since plaintiff alone has sustained injury by reason of the violation of his agreement by Forsyth, the action was properly brought by Pettit. The authorities cited by appellant upon this point we deem inapplicable to the facts of the case, and we therefore pass them by without specific attention.

2. It is alleged in the complaint that ''at the procurement of defendant, an assessment of $600 per share, including said 152 shares so owned and held by plaintiff, was levied upon the capital stock of said corporation, payable on or about the twenty-second day of May, 1899''; that it was sold on said day and plaintiff's said stock became delinquent on account of nonpayment of said assessment, and thereafter, on June 12, 1899, ''was duly advertised and sold to pay said delinquent assessment,'' which he was unable to pay, and was ''sold away from plaintiff'' and ''the whole of said stock became and was lost to him.'' The evidence showed that the stock was sold and bid in by the corporation. It is contended that these allegations are insufficient to show that the directors had jurisdiction to levy the assessment because they fail to show that

one-fourth of the capital stock of the corporation had been subscribed, as required by section 331 of the Civil Code; citing *San Bernardino I. Co.* v. *Merrill,* 108 Cal. 490, [41 Pac. 487], where it was held that "unless one-fourth of the capital stock had been subscribed, the directors had no authority to levy the assessment on which the action was brought." But we think defendant has cured the error by alleging in his answer that one-third, to wit, 334 shares, were issued to plaintiff and Sprower, which was more than one-fourth, and satisfied the statute. (*Vance* v. *Anderson,* 113 Cal. 532, [45 Pac. 816].)

3. There is no distinct allegation of ownership or of the value of the stock belonging to plaintiff other than of date "on or about April 19, 1899," and the stock was sold June 12th following. The rule that "a thing once proved to exist continues as long as is usual with things of that nature" (Code Civ. Proc., sec. 1963, subd. 32) might apply to show that proof of ownership at a previous date is evidence from which the ultimate fact of ownership at a subsequent date might be shown, but this is a rule of evidence, and has no application to a statement of facts in a pleading. Whether the rule would also apply to the question of value may be doubted, for it can hardly be said that the value of corporation shares is a thing of such nature as is usual to continue. Quite the contrary, shares of corporations are subject to frequent and radical fluctuations in value.

Defendant admits in his answer that on or about April 19, 1899, "plaintiff was the owner and holder of 152 shares of the capital stock which were issued to him as aforesaid, but not in pursuance of the terms and provisions of said agreements; and denies that said shares were of the value of $15,200, or of any value whatever in excess of the sum of $760. And said defendant alleges in that behalf that said capital stock of said corporation was on or about the nineteenth day of April, 1899, and at the time the shares of stock so alleged to be owned by the plaintiff were sold as alleged in plaintiff's complaint, of the value of $5 per share." Here is an issue tendered as to the value of the shares at the time they were sold and would, under the rule in *Vance* v. *Anderson,* 113 Cal. 532, [45 Pac. 816], cure the error. But the answer does not so plainly cure the failure to aver ownership at that time.

By a liberal construction of the complaint, however, it may be said that such issue is presented. Respondent contends that the averment that "said stock was sold away from plaintiff" implies ownership at that time, for the reason that unless he was the owner, it could not be "sold away from" him, nor could he have been damaged by the sale of "said stock." In alleging value of this same stock at the date of its sale, defendant impliedly admits its ownership in plaintiff at that time, for defendant refers to the stock claimed by plaintiff. These matters, however, present a condition of defective allegation rather than entire absence of averments of facts necessary to be stated. The demurrer ought, in our opinion, to have been sustained and the plaintiff required to make his averments more specific in respect of the particulars mentioned as well as the averments relating to the levy of the assessment, but it is apparent from the record that no injury resulted to appellant by the action of the court, and where there is no injury there is no ground for reversal. (Code Civ. Proc., sec. 475.) Besides, at the trial, all uncertainty or ambiguity in the complaint was entirely removed as to the facts thus defectively pleaded, and it clearly appeared that appellant suffered no substantial injury therefrom.

4. It is further claimed that the complaint is insufficient in its averments of facts because it does not allege any breach of defendant's agreement to pay assessments on plaintiff's shares of stock. It must be conceded that the complaint here, as elsewhere, is lacking in definiteness. The pleader should have shown by clear averment that the assessment was levied for the purposes mentioned in the agreement, "B," thus showing that when defendant failed to pay the assessment, he violated the condition upon which his liability depended. (*Henry* v. *City of Sacramento*, 116 Cal. 628, 631, [48 Pac. 728]; *Cox* v. *McLaughlin*, 63 Cal. 196.) But while we think the complaint obnoxious to demurrer for uncertainty, it is not wholly insufficient in its averments of facts. The contract, "B," is part of the complaint, and by its terms defendant agreed to pay all assessments levied "for the purpose of carrying on the business of the corporation and paying the necessary expenses thereof." The statute, Civil Code, section 331, provides that assessments may be levied for these purposes. The complaint averred that "at the procurement of defendant

(who was president of the corporation and its principal stockholder, as the evidence showed), an assessment . . . was levied upon the capital stock of said corporation,'' etc.   It may be assumed that the assessment—and there was but one—was for a lawful purpose, and we think that the averments, though not definitely stating which one of the statutory purposes was referred to in the complaint, are sufficient to show that the purpose mentioned in the agreement was the purpose referred to in the pleading.   The averments as to the assessment should have been more specific, and some of the steps leading from the assessment to the sale should have been set forth and a more specific statement given as to the proceedings had in making the assessment, and not the statement of a mere conclusion.   At the trial the proceedings taken by the corporation in making the assessment were proven, and it appeared therefrom that it was made for purposes falling within the terms of contract Exhibit ''B.''   The resolution passed by the directors reads: ''That it is proper and necessary at this time to levy an assessment upon the subscribed capital stock of this corporation for the purpose of raising funds to rebuild its packing-house and plant (which had been destroyed by fire), and establish itself in business,'' which may reasonably be held to be ''for the purpose of carrying on the business of the corporation and paying the necessary expenses thereof.''   The complaint is verified, and there is no denial in the answer that an assessment was made as alleged in the complaint, nor was there objection made to the evidence establishing the fact, except the objection made at the beginning of the trial to all evidence as irrelevant and immaterial on the ground that the complaint did not state sufficient facts.

The supreme court, speaking of section 475, Code of Civil Procedure, said, in *San Jose Ranch Co.* v. *San Jose etc. Co.,* 126 Cal. 322, [58 Pac. 824] : ''When from the record we can see that the injury is not substantial, it is not such a grievance as courts will redress.   We, therefore, say in such case that the party complaining has not been injured.   He is not an aggrieved party in such sense that he needs or can obtain a correction of the error.''   This was said by Judge Temple in an opinion holding that ''Unless some very restricted meaning can be given to the amendment to section 475, it is plainly unconstitutional.''   There is still a presumption of prejudice

arising from error (*Short* v. *Frink*, 151 Cal. 83, [90 Pac. 200], citing *Rulofson* v. *Billings*, 140 Cal. 452, [75 Pac. 35], and other cases), but the court has not hesitated to say, since as well as before the amendment to section 475, that the error is without prejudice when it can declare with reasonable certainty, from the record, that the error was not prejudicial, and that the "party complaining or appealing sustained and suffered no substantial injury, and that a different result would not have been probable if such error . . . had not occurred or existed." The rule has been applied, as the section directs, to defects in pleadings, to instructions, decisions, judgments—in fact, to practically every phase of the proceedings in a case.

It is entirely clear to our minds that defendant suffered no prejudice or substantial injury by the overruling of his demurrer. Should the case go back, simply to have the complaint amended in the particular just noted, the proofs would be the same, for they are undisputed matters of record.

These observations will apply to the motion for nonsuit, which was denied, as it was founded upon the grounds set forth in the demurrer.

5. It is contended that the evidence is insufficient to justify the verdict and judgment. The argument proceeds mainly upon the assumption that defendant's agreement was to protect the joint stock of plaintiff and Sprower, and that "he never agreed with the plaintiff personally to protect his stock from any assessment levied against him individually." We have already considered this point, and reached the conclusion that the purpose was to bind Forsyth to pay any assessment that might be levied on any of the stock while in the hands of either of the parties of the second part. If this is the proper construction of the contract, then it disposes of this objection to the verdict and judgment.

It is by no means easy to follow the mutations of the shares issued by the company as shown by the record. We have been at some pains to search out the ultimate facts shown in the numerous manipulations which the shares underwent, and to determine whether the 152 shares now involved were issued to plaintiff pursuant to the contract.

The company was incorporated July 23, 1896; number of shares, 1,000; value, $100 each. The capital stock was in-

creased September 14, 1897, to 2,500 shares of $100 each. All the additional shares were issued to Mrs. Forsyth for money paid to the company by her or Col. Forsyth. This increase of stock, however, is immaterial to any issue in the case, and did not in any way affect defendant's liability under his contract.

Certificate No. 1 was issued to defendant, Forsyth, for 980 shares, 20 shares less than the whole number. Certificate No. 2 was issued July 29, 1896, to plaintiff, Pettit, for 5 shares to qualify him as director, and the other 15 shares presumably went to the other persons acting as directors. It is not important to trace them. September 23, 1897, Certificate No. 13 was issued to Pettit and Sprower for 329 shares, which with the 5 shares issued to Pettit (Certificate No. 2) made 334 shares, conceded by defendant to be the number to which they were entitled under the contract. On the same day (September 23, 1897) Certificate No. 13 was canceled by Certificate No. 14 issued to Forsyth, trustee, for 314 shares, and by Certificate No. 15 for 15 shares sold by Pettit to E. J. Baber, who was secretary of the company, and a director, and the certificate was issued to him, and on the same day No. 15 was canceled and reissued, as No. 16, to Forsyth. May 2, 1898, Certificate No. 14 was canceled by issue of Certificates Nos. 24 and 25. No. 24 was for 100 shares issued to Baber; reissued as Certificate No. 26 to Bank of Central California as pledgee, to secure $500 borrowed for Pettit's use; No. 26 was reissued, after the debt was paid, as Certificate No. 30 to Forsyth; No. 30 was reissued to plaintiff as Certificates Nos. 32 and 33 for 50 shares each. This accounts for 100 shares of Certificate No. 24. Certificate No. 25, for 214 shares, remaining of the 329 after sale of 15 shares, was issued to Forsyth, as trustee. This certificate was canceled by issue of Certificate No. 28 to John M. Chapman for 167 shares, representing Sprower's one-half of the original 334 shares, and Chapman assigned the certificate to Forsyth. This left in Forsyth, trustee, 47 shares, which were represented by Certificate No. 29. On April 12, 1899, Certificate No. 29 was canceled and, in lieu thereof, Certificate No. 34 was issued to plaintiff for 26 shares, and Certificate No. 35 for the 21 shares remaining of the 47 shares and also for the 5 shares originally issued to him, thus canceling Certificate No. 2, which, with the 21

shares, made 26 shares in Certificate No. 35. Thus we trace
167 shares issued to Chapman, being Sprower's half of the
334 shares; and we trace 152 of Pettit's shares to him which,
with the 15 sold to Baber, make his 167 shares. Plaintiff
never had absolute control of any shares until these 152 shares
were issued to him. He testified that he had no recollection
of ever having actual possession of the 5 shares, although
finally they came to him in Certificate No. 35. He testified
that Forsyth refused to issue any shares to him until after
the patent mentioned in the contract was issued, and, in fact,
these 152 shares were not issued until after the patent had
issued and some time after Pettit had ceased to be a director.
There was evidence from which the jury might well have con-
cluded, as they no doubt did, that the shares issued to Pettit
and Sprower were never received by them, and the record
shows that all but 15 shares were reissued to Forsyth as
trustee, and the 15 came to him the same day through Baber.
Defendant introduced an assignment executed by Pettit and
Sprower of these shares to Baber and also an assignment by
Pettit to Forsyth of all his interest in the shares of the com-
pany. But these transactions were satisfactorily explained
as not intended to convey the title, and that all the time
Forsyth was acting as trustee in so holding the shares. It
was several months later when finally Forsyth, as president,
and Baber, as secretary, issued to Pettit the shares in ques-
tion and then for the first time Pettit came to his own.

The evidence shows that Forsyth himself severed whatever
of interests Pettit and Sprower held together and became the
owner of Sprower's half, and in issuing to Pettit the shares
in question he gave full recognition to Pettit's ownership in
severalty. In a letter written by Forsyth to Pettit, Decem-
ber 17, 1898, he said: "You originally had 16,700 shares
[referring obviously to the par value and not to the number
of the shares], so that if you had your stock clear now you
would be entitled to $1,020 of the insurance money." For-
syth finally issued the shares in question, and his explanation
as a witness was, that he gave the stock to Pettit as an induce-
ment to go to New York and testify in an anticipated lawsuit.
Pettit denied this on the witness-stand; the evidence otherwise
contradicted Forsyth's statement, and showed that Pettit got
just what he was entitled to under his contract with Forsyth.

6. The court, by instruction No. 1, told the jury that if they found the evidence to be as suggested in the instruction, defendant "would be liable to plaintiff for such damages as were suffered by plaintiff." In other instructions the jury were told that they were to determine the value of the stock at the time of the assessment; that if they should find that the stock had been increased to 2,500 shares, a verdict for plaintiff should not be for "a greater interest or proportion of the capital stock of said corporation than 152 shares bear to 2,500 shares." The jury were also told that "in fixing the value of the said 152 shares of stock, you may take into consideration the value of the assets of the company at the time of the assessment sale. It is admitted by the defendant that at said time the tangible assets of the company were $25,000, and that in addition to this the company owned the so-called Pettit patent, and it will be for you to determine the value of this patent. When you determine the value of the patent, you must add that value to the $25,000, and the aggregate will be the value of the assets of the corporation. From this data you will be able to determine the value of the 152 shares of the plaintiff." There was evidence that the patent was of the value of $100,000. It is now contended that the jury were misled by the first instruction, and rendered a verdict greatly in excess of the amount justified by any evidence. The verdict was for $15,200, on which judgment was entered, accordingly. Under the instructions it was a simple mathematical proposition to determine the value of the 2,500 shares of the corporation, with assets of $125,000, to be $50 per share, or $7,600, and this, defendant contends, was the greatest amount that should, under the instruction, have been awarded as damages, whereas the jury rendered a verdict of nearly twice that amount. On defendant's motion for a new trial the court denied the motion on condition that plaintiff "within twenty days waive and remit of the judgment herein the sum of $7,581.76, with legal interest thereon from October 25, 1907." Plaintiff filed his consent in writing that such remission be made, and thereupon the motion for a new trial was denied. If it be conceded that the instructions were not clearly understood by the jury, the judgment as it stands is without prejudice to defendant.'

Other alleged errors of law relate to points already disposed of adversely to defendant.

The judgment finds support in the evidence, and is, therefore, affirmed, as is also the order denying the motion for a new trial.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 1, 1911.